1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JASON J. BRILZ,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

CASE NO.    C07-5595RJB-KLS

REPORT AND
RECOMMENDATION

Noted for June 6, 2008

Plaintiff, Jason J. Brilz, has brought this matter for judicial review of the denial of his applications for disability insurance benefits and supplemental security income ("SSI") benefits.  This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrate Judges' Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Honorable Robert J. Bryan's review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 41 years old.[1] Tr. 24.  He has a high school education and past work

_____

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

experience as a school custodian. Tr. 23, 57, 61, 399.

On August 30, 2004, plaintiff filed applications for disability insurance and SSI benefits,[2] alleging disability as of July 27, 2004, due to a bipolar disorder, severe depression and panic attacks. Tr. 15, 56-57. It appears that both of his applications were denied at the initial determination level, and that at least his disability insurance benefits application was denied at the reconsideration determination level as well. Tr. 24-25, 42, 45.[3]  A hearing was held before an ALJ on March 20, 2007, at which plaintiff, represented by legal counsel, appeared and testified, as did a vocational expert. Tr. 396-414.

On April 23, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

> (1) at step one of the sequential disability evaluation process,[4] plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability;
>
> (2) at step two, plaintiff had "severe" impairments consisting of depression and anxiety disorders, with relapses on marijuana, alcohol and methamphetamines;
>
> (3) at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and
>
> (4) at step four, plaintiff had the residual functional capacity to work at an unlimited exertional level, with other non-exertional limitations, which did not preclude him from performing his past relevant work.

---

[2]The parties disagree as to whether plaintiff actually filed an application for SSI benefits.  No copies of either application are contained in the record.  Defendant argues that despite plaintiff's claim that he filed such an application, the administrative law judge ("ALJ") in this case focused only on the application for disability insurance benefits.  See Tr. 15-23, 399.  Defendant also points to a memorandum from plaintiff's legal counsel to the ALJ, in which again reference is made only to the disability insurance benefits application. Tr. 109.  As pointed out by plaintiff, however, other evidence in the record indicates that an application for SSI benefits was filed and then processed by the Social Security Administration ("SSA") along with the application for disability insurance benefits.  See Tr. 24-25 (referring to a "Concurrent Title II [disability benefits]/XVI [SSI benefits] claim" in the "REMARKS" section).  Indeed, on November 30, 2004, the SSA sent plaintiff a notice informing him that his applications for disability insurance and SSI benefits had been denied at the initial review level (Tr. 45), although a subsequent notice of denial at the reconsideration level addressed solely the disability insurance benefits application (Tr. 45).  This may be because plaintiff did not mark any of the boxes on the request for reconsideration form specifically designated for indicating a claimant's desire to appeal an adverse SSI benefits determination. See Tr. 44; but see Tr. 24 (indicating not disabled determination at reconsideration level for disability insurance benefits ("DIB") in the "TYPE CLAIM (Title II)" section, but again noting "Concurrent Title II/XVI claim" in the "REMARKS" section as well).  The above reconsideration denial notice also may be why the ALJ treated this matter as one concerning only an application for disability insurance benefits.  While this issue has no bearing on the matter currently before the Court – i.e., whether the ALJ properly found plaintiff capable of working and thus not disabled – it certainly would be wise for the Commissioner to resolve it on remand should  plaintiff subsequently be found disabled upon further consideration, which then would necessitate a determination as to the type and nature of benefits to be granted therefor.

[3]See footnote 2 above.

[4]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

Tr. 15-23.  Plaintiff's request for review was denied by the Appeals Council on August 29, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 5; 20 C.F.R. § 404.981.

On October 29, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings for the following reasons:

(a)    the ALJ erred in evaluating the medical evidence in the record;

(b)    the ALJ erred in assessing plaintiff's credibility;

(c)    the ALJ erred in evaluating the lay witness evidence in the record;

(d)    the ALJ erred in assessing plaintiff's residual functional capacity;

(e)    the ALJ erred in finding plaintiff capable of performing his past relevant work; and

(f)    the Commissioner failed to show plaintiff was capable of performing other work existing in significant numbers in the national economy.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that while the ALJ's decision should be reversed, this matter should be remanded to the Commissioner for further administrative proceedings.  Although plaintiff requests oral argument in this matter, the undersigned finds such argument to be unnecessary here.

<u>DISCUSSION</u>

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  <u>Hoffman v. Heckler</u>, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Fife v. Heckler</u>, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); <u>Carr v. Sullivan</u>, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision.  <u>Allen v. Heckler</u>, 749 F.2d 577, 579 (9th Cir. 1984).

I.    <u>The ALJ's Evaluation of the Medical Evidence in the Record</u>

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the

1   medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in

2   the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions

3   of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion

4   must be upheld." <u>Morgan v. Commissioner of the Social Security Administration</u>, 169 F.3d 595, 601 (9th

5   Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact

6   inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts

7   "falls within this responsibility." <u>Id.</u> at 603.

8        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be

9   supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this "by setting out a

10  detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation

11  thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences "logically flowing from the

12  evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may draw "specific and legitimate inferences

13  from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755, (9th Cir. 1989).

14       The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of

15  either a treating or examining physician. <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a

16  treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific

17  and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However,

18  the ALJ "need not discuss *all* evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>,

19  739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only

20  explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d

21  700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

22       In general, more weight is given to a treating physician's opinion than to the opinions of those who

23  do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

24  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings"

25  or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190,

26  1195 (9th Cir.,2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan v. Halter</u>, 242

27  F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the

28  opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion

1  may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id.

2  at 830-31; Tonapetyan, 242 F.3d at 1149.

3        Plaintiff argues the ALJ erred in failing to give appropriate weight to the opinions of his treating

4  and examining physicians.  Specifically, plaintiff asserts the ALJ did not mention in his decision many

5  significant medical findings which support his disability claim.  Most of those findings, however, were not

6  made by a treating or examining physician.  In addition, while as noted above the ALJ must explain why

7  "significant probative" evidence has been rejected, none of the findings plaintiff points to actually meet

8  that criteria.  For example, plaintiff notes that Davis Clowers, a registered nurse who had been seeing him

9  for mental health issues gave a diagnosis of depression in mid-October 2004, further reporting that he was

10  depressed, "near tears at times," and "not sure about what he should do in regards to his relationship." Tr.

11  159-60.  Plaintiff further notes Mr. Clowers stated in mid-December 2004, that "returning to work at this

12  time would not be helpful to" his "condition." Tr. 183.

13        The mere fact that plaintiff may have a mental impairment and exhibit some symptoms stemming

14  therefrom, however, is not sufficient to establish the presence of work-related limitations, significant or

15  otherwise. See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (mere existence of impairment is

16  insufficient proof of disability).  Indeed, the undersigned is hard-pressed to see what relevance indecision

17  concerning a personal relationship has to the determination of disability here, without further evidence that

18  such indecision is directly related to performance in a work setting.  Simply put, although Mr. Clowers'

19  statements here certainly constitutes evidence that plaintiff has a mental health condition that affects him

20  in some way, it sheds little, if any, light on his ability to work.

21        It is true that Mr. Clowers stated in a mid-December 2004 letter to plaintiff that he thought a return

22  "to work at this time would not be helpful to your condition." Tr. 183.  As support for this statement, Mr.

23  Clowers further stated in relevant part as follows:

24      . . . Your current mood is anxious and depressed.  Anticipated return to work,
        especially work at specific sites, tends to increase the emotional tension to the point

25      that return to work would probably worsen your symptoms of anxiety and depression.
        While medications may help with mood, they have no effect on the actual conditions

26      at work. . . .

27  Id.  Plaintiff fails to point out, however, that on August 16, 2005, he told Mr. Clowers that he now felt as

28  though he was "in a good mood." Tr. 289.  Mr. Clowers also noted plaintiff's affect as being "bright and

REPORT AND RECOMMENDATION
Page - 5

1    cheerful," and diagnosed him with an "[i]mproved mood." Id.

2    This encounter was followed shortly by another letter from Mr. Clowers to plaintiff, dated August

3    17, 2005, which stated in relevant part:

4    . . . Since the time of your dismissal, your treatment has progressed.  You are now on
     less medication than before, you have attended individual and group therapy which has
5    led to better use of coping skills, improved mood and a more stable positive attitude.

6    As we discussed, during the time leading up to your dismissal from work, you were
     suffering from the symptoms of your depression.  In addition, you were on medications
7    which may have affected your work performance and also may have interfered with
     your attempts to return to work.  This situation has now resolved to the point where a
8    return to work is more feasible.

9    I would be supportive of your return to work, as well as any allowance by your former
     employer, union and other agencies which would be involved in helping you re-enter
10   the work force.

11   Tr. 352.  This letter thus directly contradicts the letter written by Mr. Clowers eight months earlier in mid-

12   December 2004, which plaintiff points to as evidence of his inability to work. Tackett v. Apfel, 180 F.3d

13   1094, 1098 (9th Cir. 1999) (claimant must show he or she suffers from medically determinable impairment

14   that can be expected to result in death or that has lasted or can be expected to last for continuous period of

15   not less than twelve months).

16   In late November 2005, furthermore, Mr. Clowers reported that plaintiff rated his mood as a 7-8,

17   that he was tolerating his medication well, and that he denied any episodes of panic. Tr. 281.  Mr. Clowers

18   concluded that plaintiff's anxiety therefore appeared to be "well managed." Id.  In mid-June 2006, plaintiff

19   again reported that he felt "good" with his medication. Tr. 263.  In late October 2006, plaintiff informed

20   Mr. Clowers that he had "been doing well without the use of medication." Tr. 350 (emphasis added).  The

21   reports and findings from Mr. Clowers dated subsequent to the letter he wrote in mid-December 2004, thus

22   show that Mr. Clowers felt not only that plaintiff could return to work, but that plaintiff himself believed

23   he was doing well from a mental standpoint, even when not on medication.

24   Plaintiff next points to a progress note from Mark Masterson, a licensed social worker, who wrote

25   in late January 2005, that plaintiff had "life long symptoms of severe depression and panic" and "feelings

26   of helplessness." Tr. 181.  Again, the mere fact that a claimant has mental health symptoms, without some

27   evidence that they have an impact on the claimant's ability to perform work tasks, does not alone

28   constitute evidence of work-related limitations.  In addition, to the extent that plaintiff is reporting these

symptoms as having been with him his whole life, the fact that he has been able to work in the past despite their presence strongly indicates they are not disabling in nature.

Similarly, two May 19, 2005 progress reports from mental health treatment providers, in which it was reported that plaintiff was "easily tearful," and that he had been brought to the hospital after an encounter with the police in which he "apparently had hoped" they "would shoot him," is not significant probative evidence the ALJ was required to consider. Tr. 335, 337.  Once more, while this is evidence of the presence of mental health symptoms, it sheds no light on whether those symptoms had, or continued to have, any impact on plaintiff's ability to perform actual work-related tasks.  Indeed, one of those progress notes show improvement in his condition that very same day. Tr. 335.

Plaintiff notes that in late May 2005, Sherri R. Holman, M.A., diagnosed him with a recurrent major depressive disorder, a panic disorder without agoraphobia and cannabis abuse. Tr. 328.  As noted above, though, the existence of mere diagnoses of mental impairments is not sufficient to establish work-related limitations, let alone disability.  Plaintiff also notes that Ms. Holman rated him with a current global assessment of functioning ("GAF") score of 45, and opined that he met the criteria for admission to an intensive outpatient mental health treatment program. Id.  The fact that plaintiff may be eligible for being admitted to a treatment program, however, again does not in itself establish that he in any way is restricted from working.

In regard to the GAF score given by Ms. Holman, it is true that a GAF score "is relevant evidence" of a claimant's ability to function mentally, and that a GAF score of 45 indicates "'[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007). England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007).  However, while a GAF score thus may be "of considerable help" to the ALJ, for example, in assessing a claimant's residual functional capacity, "it is not essential" to the accuracy of that assessment. Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).

The "failure to reference the GAF score" in assessing a claimant's residual functional capacity in itself, therefore, does not make the residual functional capacity assessment inaccurate. Id.  It appears from the record that Ms. Holman only saw plaintiff this one time.  The report Ms. Holman gave also included no

1   opinion regarding plaintiff's continuing ability to function or his ability to function at any time during the

2   past year.  Thus, it seems the GAF score she assessed plaintiff with was of narrowly limited value at best.

3   Indeed, just two and a half months later, as noted above, plaintiff was observed by Mr. Clowers to be

4   doing much better and to be capable of returning to work.  Accordingly, to the extent there was any error

5   here in the ALJ's failure to mention the GAF score, such error was harmless.  See Stout v. Commissioner,

6   Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where non-prejudicial to

7   claimant or irrelevant to ALJ's ultimate disability conclusion).

8          In terms of medical evidence from examining or treating physicians, plaintiff notes that on June 1,

9   2005, Neff R. Breen, M.D., reported that he was complaining of poor sleep, low energy, diminished

10  appetite, and poor concentration. Tr. 320.  Dr. Breen diagnosed him with a recurrent major depressive

11  disorder, a possible borderline adjustment disorder and dysthymia. Tr. 322.  While "[a] patient's report of

12  complaints, or history, is an essential diagnostic tool," and "[a]ny medical diagnosis must necessarily rely

13  upon the patient's history and subjective complaints," the complaints themselves are not objective medical

14  evidence. Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997) (citation omitted).

15         As explained below, furthermore, the ALJ did not err in discounting plaintiff's credibility regarding

16  his symptoms and complaints.  See also Morgan v. Commissioner of the Social Security Administration,

17  169 F.3d 595, 601 (9th Cir. 1999) (opinion of physician premised to large extent on claimant's own

18  accounts of her symptoms and limitations may be disregarded where those complaints have been properly

19  discounted).  Nor, as discussed above, is a diagnosis itself evidence of work-related limitations, significant

20  or otherwise.  For the same reasons, Dr. Breen's diagnosis of a major depressive episode and notation that

21  plaintiff's affect appeared glum on June 10, 2005 (Tr. 306), also do not constitute significant probative

22  evidence.

23         Next, plaintiff points to the fact that he complained of back pain to Mark A. Wozniak, M.D., and

24  that Dr. Wozniak diagnosed him with chronic pain and degenerative changes of the spine. Tr. 292-93.

25  Again, plaintiff's own complaints and a diagnosis of an impairment in themselves are not indicative of a

26  disability, let alone any work-related limitations.  Indeed, in the same treatment notes, Dr. Wozniak notes

27  that plaintiff reported medication helped with the pain and made him more active. Id.  Objective medical

28  findings made by Dr. Wozniak also were largely unremarkable, except for "some mild lumbar discomfort"

1  in plaintiff's back. Tr. 293.  As such, there is no error on the ALJ's part here as well.

2         Plaintiff argues the ALJ failed to provide any legitimate reasons for rejecting the statement of one

3  of his mental health counselors, Normal L. Covington, who reported in late January 2007, that although he

4  now worked as a substitute custodian, he lately could not "answer the phone because of the panic attacks."

5  Tr. 369.  While the ALJ did mention this statement in his decision, he provided no analysis thereof (Tr.

6  19), though the ALJ did later find plaintiff's claim that he still had trouble answering the telephone when

7  depressed to be not entirely credible (Tr. 22).  The ALJ, however, was not required to make any findings in

8  regard to the above statement made by Ms. Covington, as she was only reporting what plaintiff had told

9  her, and, as such, does not constitute objective medical evidence.  The real issue here, in other words, is

10  plaintiff's credibility regarding the claim in that statement, which is dealt with in detail below.

11         Plaintiff further argues the ALJ failed to properly consider all of the evidence in finding that he was

12  doing well, while ignoring other evidence in the record of the problems he was having.  Plaintiff points to

13  a March 6, 2007 progress note provided by Ms. Covington, which the ALJ found reflected improvement in

14  mood and anxiety, a desire to "meet someone new" and receptivity to "suggestions of keeping a positive

15  mental image." Tr. 19, 361.  Plaintiff states the ALJ erred by not mentioning that Ms. Convington also had

16  noted therein that he reported starting to have sleep problems gain, and was still being hesitant about

17  answering the telephone and working, which brought out a lot of panic and anxiety. Tr. 361.  Plaintiff also

18  notes that Ms. Covington observed that he was "a bit anxious" and "sat on the edge of the couch," and that

19  they both decided to meet once a week. Id.

20         Plaintiff asserts that considered in its entirety, Ms. Covington's progress note fails to show that he

21  had improved to the point that he could be expected to perform competitive employment.  While it may be

22  true that the progress note itself is insufficient to establish the ability to work, neither does it demonstrate

23  an inability to do so on the part of plaintiff.  First, most of the statements plaintiff points to in support of

24  his claim of disability are his own self-reports, which, as explained previously, do not constitute objective

25  medical evidence.  Nor do those self-reports themselves establish the existence of any specific work-

26  related limitations – other than perhaps the hesitancy he expressed about answering the telephone and

27  working – or the fact that weekly counseling sessions are a sign of an inability to work.  In addition, Ms.

28  Covington's assessment does indicate improvement in a number of areas.  See id.

Plaintiff also points to a GAF score of 50 assessed by Daniel Lam, M.D., in mid-May 2007 (Tr. 374), and a GAF score of 45 assessed by Dr. Lam in late June 2007 (Tr. 370), as evidence that his mental functioning continued to be impaired. See England, 490 F.3d at 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).  The reports containing the two GAF scores, however, were provided by Dr. Lam and submitted to the Appeals Council after the ALJ issued his decision on April 23, 2007.  As such, the ALJ did not have these reports before him, and thus cannot be faulted for failing to consider them.  The question then is to what extent and in what context the Court itself may consider that evidence.  Neither party has addressed this issue.

It is not clear exactly what plaintiff is asking the Court to do with the evidence from Dr. Lam.  He does request that at a minimum this matter should be remanded to the Commissioner for a new hearing to allow the ALJ to review that evidence.  To the extent plaintiff is requesting the Court also to consider the evidence from Dr. Lam in determining whether the ALJ's decision is supported by substantial evidence, the Court may do so. See Ramirez v. Shalala, 8 F.3d 1449, 1451-52 (9th Cir. 1993); see also Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000) (additional materials submitted to Appeals Council properly may be considered, because the Appeals Council addressed them in context of denying claimant's request for review); Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996) (evidence submitted to Appeals Council is part of record on review to federal court).

The undersigned finds, however, that the two GAF scores assessed by Dr. Lam alone would not be sufficient to produce a finding that the ALJ's decision is unsupported by substantial evidence.  As noted by defendant, there is very little, if any, in the way of an explanation by Dr. Lam for those low scores.  Indeed, plaintiff himself admits that this is a valid reason for the Court to decline to exercise its discretion to award benefits outright. (Dkt. #14, p. 5); see Batson, 359 F.3d at 1195 (ALJ need not accept opinion of treating physician if it is inadequately supported by clinical findings).  Accordingly, the undersigned finds the GAF scores assessed by Dr. Lam create an insufficient basis for reversing the ALJ's decision.

With respect to whether this matter should be remanded to the Commissioner based on Dr. Lam's findings, resolution of this issue is less clear.  Ramirez, Harman and Gomez appear to be inapplicable here, because the claimants in those cases all sought judicial review of the propriety of the ALJ's decision based on the evidence that was not before the ALJ and submitted for the first time to the Appeals Council, rather

1    than remand for further consideration of the newly submitted evidence.  In <u>Mayes v. Massanari</u>, 276 F.3d

2    453, 462 (9th Cir. 2001), however, the claimant specifically had sought such remand.

3         In <u>Mayes</u>, the Ninth Circuit applied the standard set forth in 42 U.S.C. § 405(g) to determine

4    whether to remand that case in light of additional evidence submitted to the Appeals Council.  <u>Id.</u> at

5    461-62.  Under that standard, to justify remand, the claimant must show that the additional evidence is

6    both "new" and "material" to determining disability, and that he or she "had good cause for having failed

7    to produce that evidence earlier."  <u>Id.</u> at 462.  To be material under 42 U.S.C. § 405(g), "the new evidence

8    must bear 'directly and substantially on the matter in dispute.'"  <u>Id.</u> (citation omitted).  In addition, the

9    claimant must demonstrate a "reasonable possibility" that the new evidence "would have changed the

10   outcome of the administrative hearing."  <u>Id.</u> (citation omitted).  To demonstrate "good cause," the claimant

11   must show that the new evidence "was unavailable earlier."  <u>Id.</u> at 463.  The good cause requirement will

12   not be met by "merely obtaining a more favorable report once his or her claim has been denied."  <u>Id.</u>

13        It is not clear whether a showing of "good cause" is actually required in the Ninth Circuit, as the

14   Court of Appeals expressly noted in <u>Mayes</u> that the plaintiff in that case had conceded that such a showing

15   was required.  <u>Id.</u> at 461 n.3.  The Court here need not resolve that issue, however, as for the same reasons

16   plaintiff has failed to show the two GAF scores assessed by Dr. Lam are insufficient to produce a finding

17   that the ALJ's determination is supported by substantial evidence, he also has failed to demonstrate a

18   reasonable possibility that evidence would have changed the outcome of the administrative proceedings.

19   As such, the undersigned finds the Court should not remand this matter on that basis.  However, because,

20   as discussed below, this matter should be remanded for other reasons, the Commissioner on remand should

21   review this additional evidence as well.

22   II.       <u>The ALJ's Assessment of Plaintiff's Credibility</u>

23        Questions of credibility are solely within the control of the ALJ.  <u>Sample v. Schweiker</u>, 694 F.2d

24   639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination.  <u>Allen</u>, 749

25   F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is

26   based on contradictory or ambiguous evidence.  <u>Id.</u> at 579.  That some of the reasons for discrediting a

27   claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as

28   long as that determination is supported by substantial evidence. <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148

1   (9th Cir. 2001).

2        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for

3   the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must

4   identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

5   Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is

6   malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."

7   Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. O'Donnell v.

8   Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

9        In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility

10   evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other

11   testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ

12   also may consider a claimant's work record and observations of physicians and other third parties

13   regarding the nature, onset, duration, and frequency of symptoms. Id.

14        Here, the ALJ discounted plaintiff's credibility in part for the following reason:

15        . . . He acknowledged working 4-to-5 hours as a substitute school custodian at $12.90
     [an] hour starting in February 2006.  He had earnings commensurate with levels of
16        substantial gainful activity (SGA) for March-April, July, August and September 2006.
         . . .

17   Tr. 22.  In challenging the ALJ's finding here, plaintiff first points out that he did not work from July 27,

18   2004, until February 2006, which is a period of more than twelve months.  Plaintiff, however, has claimed

19   a continuing inability to work.  Accordingly, evidence that he worked subsequent to this earlier time

20   frame, and that he received earnings at the level of significant gainful activity for a substantial period

21   thereafter belies that claim.

22        Citing to Lingenfelter v. Astrue, 504 F.3d 1028 (9th Cir. 2007), plaintiff further argues that the fact

23   that he attempted to return to work is not a convincing reason to reject his testimony.  But Lingenfelter is

24   distinguishable on its facts.  In that case, the Ninth Circuit stated that the mere "fact that a claimant tried to

25   work for a short period of time and, because of his impairments, *failed*," does not mean "that he did not

26   then experience pain and limitations severe enough to preclude him from *maintaining* substantial gainful

27   employment." Id. at 1038 (emphasis in original).  The Court of Appeals found this reason to be "especially

28   unconvincing" where the claimant had attempted to work "only because of extreme necessity," because

1     "[u]nder these circumstances, it is at least as likely that the claimant tried to work in spite of his symptoms,

2     not because they were less severe than alleged." Id. at 1038-39 (quoting ALJ).

3          In Lingenfelter, the claimant was fired from a job he had performed for a period of nine weeks after

4     his date last insured, "because he was too slow to do the work adequately." Id. at 1033.  The claimant also

5     testified that "when he returned home from work each day his 'feet were so swollen,' and that he 'just

6     couldn't do it anymore' because of the pain." Id. (quoting plaintiff).  The record in this case, however,

7     contains no probative evidence that plaintiff was forced to stop working in 2006, due to his impairments

8     and limitations.  The Ninth Circuit in Lingenfelter also expressly noted that the claimant's "failed work

9     attempt did not even take place during the relevant time period" – i.e., the period between his alleged onset

10     date of disability and his date last insured. Id. at 1039 (noting claimant had burden to prove he was

11     disabled for at least twelve month period during that time).

12          Here, though, the period of plaintiff's work activity at issue occurred prior to his date last insured,

13     December 31, 2008. Tr. 15.  Plaintiff argues that this reading of Lingenfelter misconstrues the Court of

14     Appeals' finding, asserting that the relevant time period in that case was defined as the first twelve months

15     after a claimant's alleged onset date, not the time period from the alleged onset date until the date of the

16     ALJ's decision.  Actually, as noted above, the Ninth Circuit stated that the relevant time period was the

17     period between the claimant's alleged onset date of disability and his date last insured, and that a period of

18     work that occurred outside that time frame was irrelevant because of the claimant's burden of proof was to

19     show he was disabled for a period of twelve months within that time frame. Id.  Plaintiff's argument here,

20     therefore, is without merit.

21          Plaintiff makes much of the following statement made by the Court of Appeals:

22         . . . [W]e also find significant that the Social Security Administration permits recipients
           of disability benefits to work on a trial basis without the trial work period adversely

23            affecting their disability status.  Specifically, when a recipient works for less than nine
           months, the Administration does not consider the trial work period as evidence that the

24            individual is no longer disabled. . . . By analogy, if working for almost nine months is
           not evidence that a disability recipient is no longer disabled, then a nine week

25            unsuccessful work attempt is surely not a clear and convincing reason for finding that a
           claimant is not credible regarding the severity of his impairments.

26

27     Id. (internal citations omitted).  However, it is clear the Ninth Circuit had in mind here a claimant, such as

28     the one in Lingenfelter, who had shown he was unable to continue with his unsuccessful work attempt due

    to his actual impairments and limitations stemming therefrom. See id.  As discussed above, however, such

REPORT AND RECOMMENDATION
Page - 13

1   is not the case here.

2       In addition, the undersigned agrees with defendant that it is significant that in <u>Lingenfelter</u> the ALJ

3   had offered the plaintiff's unsuccessful work attempt as only one of two stated reasons for discounting his

4   credibility.  The other stated reason – that there was a consensus of medical opinion in the record that the

5   claimant retained the capacity to perform sedentary work – the Ninth Circuit found was not supported by

6   substantial evidence, but rather the opposite appeared to be true. <u>Id.</u> at 1037-38.  Given this, the Court of

7   Appeals concluded that plaintiff's nine-week work period "alone" was "not a clear and convincing reason

8   for rejecting" the claimant's subjective pain and symptom testimony. <u>Id.</u> at 1038.

9       Plaintiff argues there is no meaningful distinction between this case and <u>Lingenfelter</u> on this basis,

10  because although the ALJ here provided other reasons for not finding him credible, none of those reasons

11  are clear and convincing.  The undersigned disagrees.  For example, the ALJ found as follows:

12      . . . He [plaintiff] went on to testify that he has had "no drugs since 2003."  His
    testimony is clearly not credible as the record reflects he tested positive for

13      methamphetamines (Ex. 8F/pg. 32).  He had acknowledged numerous periods of using
    marijuana as well in June and July of 2005 as well (Ex. 8F/pgs. 61-62, 65).

14

15  Tr. 22.  Plaintiff argues this is not a clear and convincing reason for discounting his credibility, because the

16  ALJ failed to mention that he testified that he was feeling suicidal at the time he tried methamphetamines

17  and did not like it. <u>See</u> Tr. 403.  The point is, however, that, regardless of the reason why plaintiff tried it

18  or of the fact that he ultimately did not like it, the positive test performed in May 2005 (Tr. 292, 403),

19  directly contradicts his testimony that he had not used any drugs since 2003 at the latest (Tr. 403).

20      Plaintiff further argues his testimony shows a lack of certainty concerning when he actually

21  stopped using drugs, indicating he was not sure whether he had stopped using them back in 2003, and

22  implying that it could have been much later.  His testimony is fairly clear, however, and reads in relevant

23  part:

24      Q:    . . . And so, Mr. Brilz, when is the last time you used any drugs?

25      A:    Geez.  Quite a while ago . . .

26      . . . I was using it for my anxiety panic attacks but I found out that it was
    making me go deep -- more deep in thought with my problems, which actually made
    my depression worse, which was a never-ending battle, so I quit that.

27      Q:    When was that?

28      A:    I think that was the year 2002 or 2003.  I'm not sure.

1    Q:    So, no drugs since then?

2    A:    Yeah.

3   Tr. 402-03.  Given plaintiff's answer of "[y]eah" to the follow-up question, it is much more likely that he

4   was not quite sure whether the year he quit was 2002 or 2003, and not that he was uncertain whether that

5   was the general time frame when he stopped using drugs.  Indeed, plaintiff's own self-reports to treatment

6   providers in 2004 support his testimony that he stopped using at this time.  See, e.g., Tr. 162, 166, 170.  In

7   any event, it is solely the duty of the ALJ to resolve ambiguities and conflicts in the evidence to the extent

8   any exist.  See Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642; Morgan, 169 F.3d at 601.

9        It the ALJ had been concerned plaintiff was being dishonest about his past use of drugs, plaintiff

10   asserts, he should have asked him additional questions.  However, further questioning would have been

11   necessary only if the ALJ was unsure regarding plaintiff's credibility on this issue.  As noted above,

12   though, the ALJ checked to make sure plaintiff really was testifying that he had last used drugs in 2002 or

13   2003, before asking him about the May 2005 positive methamphetamine test.  In addition, as noted by the

14   ALJ, plaintiff had reported using marijuana on numerous occasions around that same period in 2005.  See

15   Tr. 321, 325, 327.  Plaintiff's assertion that the ALJ also should have asked plaintiff regarding his use of

16   marijuana fails for the same reason.  That is, plaintiff's earlier self-reports directly contradict his testimony

17   at the hearing, resulting in little, if any, ambiguity on this issue.

18        The ALJ further discounted plaintiff's credibility in relevant part because the record shows that in

19   October 2006, plaintiff "was noted as doing well while off of medications."  Tr. 22.  This is a valid reason

20   for doing so.  See Morgan, 169 F.3d at 599 (ALJ may discount claimant's credibility on basis of medical

21   improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  Plaintiff argues such is not the case

22   here, given the treatment notes in the record from Dr. Lam and Ms. Covington showing his symptoms had

23   again worsened.  See Tr. 361-75.  As discussed above, however, the ALJ cannot be faulted for not having

24   considered Dr. Lam's notes, since he did not have them at the time he issued his the decision.  Nor, as the

25   undersigned found above, do those treatment notes constitute a sufficient basis for remanding this matter

26   to the Commissioner.

27        Also as discussed above, furthermore, the progress notes from Ms. Covington that plaintiff relies

28   on to argue he was not improving during the first part of 2007, did show some actual improvement in

REPORT AND RECOMMENDATION
Page - 15

several areas. See Tr. 361.  Other medical evidence in the record lends additional support to the ALJ's finding that plaintiff's condition had seen improvement.  As discussed above, progress notes from Mr. Clowers show that plaintiff had improved sufficiently enough by August 2005 to return to work, and that he continued to improve overall through October 2006.  Other treatment providers noted this improvement as well. See Tr. 302, 327, 335, 365.  The ALJ thus did not err in discounting plaintiff's credibility for this reason.

Lastly, the ALJ discounted plaintiff's credibility in part for the following reason:

> . . . While he [plaintiff] also acknowledged the on-call requirement to be a substitute school custodian, he nonetheless claims he still has trouble answering the phone when depressed.  Given his SGA for all but June 2006, the undersigned finds the claimant's overall testimony is not entirely credible. . . .

Tr. 22.  Plaintiff argues this is not a clear and convincing reason for discounting his credibility, asserting there is no inconsistency between his having worked for a good portion of the year during 2006, and his claim that he has trouble answering the telephone when anxious or depressed.  The undersigned agrees. The fact that plaintiff still may have been able to work during this time does not necessarily mean he was not being truthful regarding difficulties in using the telephone.  That is, even though he did work to one extent or another at the time, his functioning still could have been impacted in this manner.  Nevertheless, the fact that one of the reasons for discounting plaintiff's credibility was improper, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence in the record overall, as it is in this case. Tonapetyan, 242 F.3d at 1148.

III.     The ALJ Failed to Properly Consider the Lay Witness Statements in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

Plaintiff argues the ALJ erred in failing to mention any of the lay witness statements in the record from his mother and sister. See Tr. 63-80. The undersigned agrees. An ALJ must consider "observations by non-medical sources as to how an impairment affects a claimant's ability to work." Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)). "Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities," furthermore, "have routinely been treated as competent evidence." Id.

Here, plaintiff's mother and sister both reported their observations concerning plaintiff's symptoms and daily activities. For example, plaintiff's mother reported that he "gets very confused at times," has "trouble with understanding," is forgetful, can pay attention "sometimes" for "a few minutes," and "gets confused" following spoken instructions. Tr. 66, 68. His sister reported that he "becomes overwhelmed if a project is a lot," "used to think more clearly" in budgeting money, had a hard time putting thoughts together, had "problems processing information," was forgetful and unable to concentrate, and got "mixed up easily" following spoken instructions. Tr. 75-77. She also reported that a lot of stress causes him to become overwhelmed and withdrawn. Tr. 78.

Defendant argues plaintiff has failed to demonstrate these lay witness observations of his symptoms and limitations were attributable to medically determinable impairments for which there is support in the record, and that did not depend on plaintiff's subjective complaints. As such, defendant argues the Court confidently can conclude that no reasonable ALJ could have reached a different disability determination even when fully crediting these statements, and thus should find any error on the part of the ALJ here to be harmless. See Stout., 454 F.3d at 1055 (error harmless if non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion).

Here, though, the ALJ found plaintiff's depression and anxiety disorders to be severe impairments. The symptoms and limitations plaintiff's mother and sister reported observing are those that certainly could be attributable to such disorders. In addition, plaintiff's mother and sister were reporting their observations of plaintiff. There is no indication that they relied, solely or otherwise, on plaintiff's own subjective complaints or what he told them in making their statements. Contrary to defendant's assertion, therefore, the undersigned is unable to confidently conclude that no reasonable ALJ could have reached a different disability determination if the lay witness statements are credited. Indeed, they reported mental

1    symptoms and limitations greater or different than those found by the ALJ. <u>See</u> Tr. 23.

2    IV.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity

3            If a disability determination "cannot be made on the basis of medical factors alone at step three of

4    the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

5    assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

6    claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or

7    she can do his or her past relevant work, and at step five to determine whether he or she can do other work.

8    <u>Id.</u>  It thus is what the claimant "can still do despite his or her limitations." <u>Id.</u>

9            A claimant's residual functional capacity is the maximum amount of work the claimant is able to

10   perform based on all of the relevant evidence in the record. <u>Id.</u>  However, a claimant's inability to work

11   must result from his or her "physical or mental impairment(s)." <u>Id.</u>  Thus, the ALJ must consider only

12   those limitations and restrictions "attributable to medically determinable impairments." <u>Id.</u>  In assessing a

13   claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional

14   limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other

15   evidence." <u>Id.</u> at *7.

16           Here, the ALJ assessed plaintiff with the following residual functional capacity:

17               . . . the claimant has the residual functional capacity for unlimited exertion with
                 vocational non-exertional limitations.  His vocational non-exertional limitations are that
18               he can perform work requiring no more than "occasional" interaction with the general
                 public.  He can perform work requiring casual, occasional interaction with co-workers
19               and supervisors, as long as the work is routine and predictable.

20   Tr. 23.  Plaintiff argues the above assessment is erroneous, because the ALJ failed to properly consider the

21   medical and lay witness testimony in the record discussed above, as well as his own testimony.  However,

22   the ALJ, as discussed above, properly evaluated that medical evidence and discounted plaintiff's

23   credibility regarding his alleged symptoms and limitations.  On the other hand, also as discussed above, the

24   ALJ did err in evaluating the lay witness evidence in the record.  Accordingly, the undersigned cannot say

25   that the ALJ's assessment of plaintiff's RFC is entirely accurate.

26           Plaintiff further argues the ALJ failed to properly consider the mental residual functional capacity

27   assessment form completed by Janis Lewis, Ph.D., in mid-November 2004, and affirmed by Thomas

28   Clifford, Ph.D., in mid-February 2005. Tr. 148-51.  In the first "Summary Conclusions" section of that

form, Drs. Lewis and Clifford, both non-examining physicians, found plaintiff to be moderately limited in his ability to maintain attention and concentration, make simple work-related decisions and interact appropriately with the general public. Tr. 148-49.  Plaintiff argues the ALJ failed to explain why he did not include the first two limitations in his RFC assessment.  The undersigned agrees.

Defendant, citing to a Social Security Administration policy manual, argues that the summary conclusions section of the mental residual functional capacity assessment form does not constitute the two psychologists' actual residual functional capacity assessment.  Instead, defendant asserts, it is the third "Functional Capacity Assessment" section of that form which formed the RFC assessment of Drs. Lewis and Clifford.  In that section, Dr. Lewis and Dr. Clifford found as follows:

> . . . The clmt [claimant] can understand, remember and carry out simple and complex instructions under normal supervision on a sustained basis and can make simple work-related decisions and judgments. . . .
>
> . . . The clmt can respond appropriately to supervisors, coworkers, but not the general public, and usual work situations on a sustained basis . . .
>
> . . . The clmt can cope with stress and adapt to changes in a routine work setting on a sustained basis . . .
>
> The clmt is able to work F/T doing simple and complex tasks.  He can accept instructions from supervisor, but would do best in a low stress environment where he has limited public contact in order to keep his sx [symptoms] of panic d/o [disorder] and depression from interfering with his work activity.

Tr. 150-51.

Given that the moderate limitations on maintaining attention and concentration and making simple work-related decisions are not included in this section, defendant argues the ALJ was not required to include them in his assessment of plaintiff's RFC.  As defendant points out, however, an agency policy manual, such as the Commissioner's Hearing, Appeals and Litigation Law Manual ("HALLEX"), unlike the Code of Federal Regulations, "is strictly an internal guidance tool, providing policy and procedural guidelines to ALJs and other staff members," and, "[a]s such, it does not prescribe substantive rules and therefore does not carry the force and effect of law." Moore v. Apfel, 216 F.3d 864, 868-69 (9th Cir. 2000).  Accordingly, neither policy manual is binding on this Court.

In addition, the ALJ did not state that he was relying solely on the findings of Dr. Lewis and Dr. Clifford contained in the functional capacity assessment section of the form they completed, or that he was doing so for the reason now asserted by defendant.  Nor did the ALJ explain why he was not adopting the

1  moderate limitations contained in the summary conclusions section, or try to resolve the discrepancy

2  between the two sets of findings.  Even if defendant was correct on this point, furthermore, no reason was

3  provided by the ALJ as to why he failed to adopt all the limitations contained in the functional capacity

4  assessment section, such as on doing "best in a low stress environment." Tr. 151.

5  V.    The ALJ's Step Four Analysis

6        Plaintiff has the burden at step four of the disability evaluation process to show that he is unable to

7  return to his past relevant work. Tackett, 180 F.3d at 1098-99.  As noted above, the ALJ found plaintiff to

8  be capable of returning to his past relevant work as a school custodian, as that job did not require him to

9  perform work-related activities precluded by this residual functional capacity. Tr. 23.  Plaintiff argues,

10 however, that because the ALJ erred in assessing his RFC, the ALJ's finding that he is capable of returning

11 to his past relevant work also is erroneous.  Again, the undersigned agrees, particularly in light of the fact

12 that the ALJ made his step four finding on the basis that plaintiff's return to such work was not precluded

13 by his residual functional capacity.

14 VI.   Step Five of the Sequential Disability Evaluation Process

15        If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

16 process the ALJ must show there are a significant number of jobs in the national economy the claimant is

17 able to do. Id.; 20 C.F.R. § 404.1520(d), (e), § 416.920(d), (e).  The ALJ can do this through the testimony

18 of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids").

19 Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

20        An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

21 posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

22 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

23 medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

24 Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported

25 by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from

26 that description those limitations he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th

27 Cir. 2001).

28        Plaintiff argues the ALJ erred at step five of the sequential disability evaluation process, because he

did not include any limitation on concentration or a limitation that the hypothetical individual would miss

at least two days of work per month due to anxiety.  While it is true the ALJ did not include either of these

limitations in the hypothetical questions he posed to the vocational expert (see Tr. 411-12), it is not clear at

all that any error occurred here.  First, while, as discussed above, the ALJ did err in failing to explain why

he did not adopt the moderate limitation on attention and concentration found by Drs. Lewis and Clifford,

it has not been established that he was required to adopt it.  Nor is there any medical evidence in the record

that plaintiff would be required to miss at least two days of work per month.

Third, and most importantly, however, because the ALJ made his disability determination at step

four, he was not required to go on to step five, and thus cannot be faulted for any improper findings made

at that step.  Plaintiff points out that because the vocational expert testified that an individual who could

not attend work twice a month or more due to his or her anxiety would not be able to sustain employment,

the Commissioner has not met his burden at this step of the sequential disability evaluation process, and

thus that he should be found disabled here.  Because, as just discussed, the record fails to reveal any real

evidence that plaintiff would miss that many days of work due to his medical condition, the Commissioner

has not failed to meet his burden at this time.  Rather, this issue must be considered further if, on remand,

it is found that plaintiff is incapable of returning to his past relevant work.

VII.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits."

Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course,

except in rare circumstances, is to remand to the agency for additional investigation or explanation."

Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in

which it is clear from the record that the claimant is unable to perform gainful employment in the national

economy," that "remand for an immediate award of benefits is appropriate."  Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative

proceedings would serve no useful purpose."  Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
> evidence, (2) there are no outstanding issues that must be resolved before a
> determination of disability can be made, and (3) it is clear from the record that the ALJ
> would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues remain with respect to the lay witness evidence in the record, plaintiff's residual functional capacity and his ability to return to his past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.  In addition, should it be found on remand that plaintiff is not capable of making such a return, the Commissioner should proceed on to step five to determine whether plaintiff is able to perform other work existing in significant numbers in the national economy.

It is true that where lay witness evidence is improperly rejected, that testimony may be credited as a matter of law.  See Schneider v. Barnhart, 223 F.3d 968, 976 (9th Cir. 2000) (finding that when lay witness evidence rejected by ALJ is given effect required by federal regulations, it became clear that claimant's limitations were sufficient to meet or equal listed impairment).  As noted by the Ninth Circuit, however, the courts do have "some flexibility" in how they apply the "credit as true" rule.  Connett, 340 F.3d at 876.  Further, Schneider dealt with the situation where, unlike in this case, the Commissioner failed to cite any evidence to contradict the statements of five lay witnesses regarding her disabling impairments. 223 F.3d at 976.  As such, the undersigned declines to apply the credit as true rule here.

Plaintiff argues that if this case is remanded to the Commissioner, the Court should direct that it be given to a different ALJ due to the bias of the ALJ in this case.  As evidence of bias, plaintiff points to the ALJ's statement that he perceived "a pattern that when" plaintiff "relapses on drugs and alcohol, he seeks medical care as an excuse to be absent or released from work." Tr. 19.  Plaintiff asserts that because of this statement, he sincerely doubts the ALJ is capable of fairly considering his disability claim on remand.  The undersigned disagrees that there is a need to order remand to a different ALJ here.

The requirements of due process demand "impartiality on the part of those who function in judicial or quasi-judicial capacities." Schweiker v. McClure, 456 U.S. 188, 195 (1982).  Hearing officers who decide social security claims are presumed to be unbiased. Id.  This presumption, however, "can be rebutted by a showing of conflict of interest or some other specific reason for disqualification." Id.  The burden of establishing such a disqualifying interest "rests on the party making the assertion." Id. at 196. That party must show "the ALJ's behavior, in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'" Rollins v. Massanari, 246 F.3d 853, 858 (9th Cir. 2001) (citing Liteky v. United States, 510 U.S. 540, 555-56 (1994)).  In addition, "actual bias," rather than the "mere

1   appearance of impropriety," must be shown in order to disqualify an ALJ. Bunnell v. Barnhart, 336 F.3d

2   1112, 1115 (9th Cir. 2003).  No such showing has been made here.

3       Plaintiff relies on the Ninth Circuit's decision in Reed v. Massanari, 270 F.3d 838 (9th Cir. 2001),

4   to argue that a disability claim should be assigned to a different ALJ based on anticipated prejudice by the

5   ALJ as revealed by comments made by the ALJ at the hearing.  Reed though is distinguishable form this

6   case on its facts.  In that case, the plaintiff argued the ALJ had exhibited bias when rejecting her request

7   for an additional consultative examination from a rheumatologist. Id. at 840.  Only two rheumatologists

8   were available, however, and the ALJ expressly stated that he did not trust either of them, even though the

9   ALJ had acknowledged that a consultative examination would have been appropriate. Id. at 840-41, 843.

10  The ALJ felt that both rheumatologists basically treated all claimants as disabled. Id. at 840.

11      The Ninth Circuit found that the ALJ's "sole basis" for his "refusal to order" such an examination

12  "was his perception" that both available rheumatologists concluded that "'everybody' is disabled," and

13  thus that this amounted to "an unfavorable review of the competence of the medical professionals recruited

14  . . . to perform consultative examinations." Id. at 843.  Such comments, the Court of Appeals went on,

15  whether "based in personal experience or personal animosity" as there was no evidence in the record to

16  support the ALJ's conclusion, had "no place in the disability evaluation process." Id. at 843-44 (citation

17  omitted).  This kind of "short, ad hoc, across-the-board disqualification" exceeded the ALJ's authority. Id.

18  at 844.  Here, on the other hand, there is evidence in the record that plaintiff had substance abuse issues, he

19  admitted he had used drugs in the past, and the ALJ properly found plaintiff's credibility regarding such

20  drug use to be impugned.  The undersigned thus finds Reed to be inapplicable to this case.

CONCLUSION

22      Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff

23  was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for

24  further administrative proceedings in accordance with the findings contained herein.

25      Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b),

26  the parties shall have ten (10) days from service of this Report and Recommendation to file written

27  objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those

28  objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit

imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **June 6, 2008**, as noted in the caption.

DATED this 12th day of May, 2008.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 24